UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------- x
                                        :
KAREN B. BELL                           :          3:19 CV 1406 (RMS)
                                        :
V.                                      :
                                        :
ANDREW M. SAUL, COMMISSIONER            :
OF SOCIAL SECURITY                      :          DATE: AUGUST 10, 2020
                                        :
-------------------------------------------------- x
```

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION
OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff

disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

I.     ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her application for DIB and SSI on October 29, 2013, claiming that she

had been disabled since December 31, 2010, due to shingles, sickle cell, diverticulitis, bursitis, and

arthritis. (Certified Transcript of Administrative Proceedings, dated November 7, 2019 ["Tr."] 97-

108). The plaintiff's application was denied initially on December 11, 2013 (Tr. 97-108), and upon

reconsideration on October 16, 2014. (Tr. 110-123).

On October 23, 2014, the plaintiff requested a hearing before an Administrative Law Judge

["ALJ"] (Tr. 138-39), and on May 12, 2016, a hearing was held before ALJ Richard J. Ortiz-

Valero, at which the plaintiff and a vocational expert testified. (Tr. 69-96). The ALJ subsequently

issued an unfavorable decision on March 22, 2017, denying the plaintiff's claims for benefits. (Tr.

10-22). The plaintiff appealed to the Appeals Council, which, on January 9, 2018, denied the

plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

The plaintiff appealed the ALJ's decision to this Court in an action filed on February 2, 2018. *See Bell v. Berryhill*, No. 3:18-CV-211 (MPS) ["*Bell 1*"]. On August 30, 2018, the defendant moved for remand. *See id.*, Doc. No. 21 ("Upon review of the record, the Commissioner finds that further development of the record and additional administrative action is warranted"). The next day, the Court remanded the matter for further proceedings. (*See id.*, Doc. No. 22).

Upon remand, on December 4, 2018, the Appeals Council issued an order remanding the case to an ALJ. (Tr. 1015-1021). The Appeals Council's order directed the ALJ to 1) "[f]urther develop the evidence of record"; 2) "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations"; 3) "[e]nsure the resume of the vocational expert is admitted into the record"; and 4) [o]btain supplemental evidence from a vocational expert." (Tr. 1018-1019).

The matter was remanded to the Office of Hearings Operations in New Haven, CT, where, on April 24, 2019, a hearing was held before ALJ Eskunder Boyd. (Tr. 885-943). The plaintiff and a vocational expert testified at the hearing. (Tr. 885). The plaintiff was represented by an attorney at the hearing. On February 15, 2018, while *Bell 1* was pending, the plaintiff filed new applications for DIB and SSI, which were denied initially and upon reconsideration. (Tr. 1102-115, 944-59, 960-75, 978-93, 994-1009).  Those applications claimed that the plaintiff had been disabled since March 23, 2017, due to depression, "hernia disc (C1)," "pancreatitis disease," "thyroid," arthritis, "diverticuli[t]is," shingles, "left shoulder condition," and vertigo. (Tr. 960-61). The ALJ noted that "[t]hose applications have been consolidated into the current case," (Tr. 837), and issued a decision

on May 15, 2019 denying the plaintiff's claims for benefits. (Tr. 837-47). No written exceptions were filed, and the Appeals Council did not take "own motion" review, thus, the ALJ's decision became the final, appealable decision of the Commissioner. *See* 20 C.F.R. § 404.984(a) ("[W]hen a case is remanded by a Federal court for further consideration, the decision of the [ALJ] will become the final decision of the Commissioner after remand . . . unless the Appeals Council assumes jurisdiction of the case."); 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of [the] case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand.").

The plaintiff filed her complaint in this pending action on September 9, 2019. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on September 18, 2019, and this case was transferred to the undersigned. (Doc. No. 9). On November 7, 2019, the defendant filed the administrative transcript. (Doc. No. 11). On March 6, 2020, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 15), with a Statement of Facts (Doc. No. 15-1), and brief in support (Doc. No. 15-2 ["Pl.'s Mem."]). On May 5, 2020, the defendant filed his Motion to Affirm the Decision of the Commissioner (Doc. No. 16 ["Def.'s Mem."]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 15) is GRANTED, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 16) is DENIED.

II.     FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the plaintiff's Statement of Facts (Doc. No. 15-1) and the Stipulation of Facts filed in

3

*Bell 1* (Tr. 858-877). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

At the plaintiff's April 24, 2019 hearing, she was 52 years old and resided in Bridgeport, Connecticut. (Tr. 893). She lived in an apartment with her two adult children. (Tr. 893-94). The plaintiff had completed "some college." (Tr. 896). She last worked in August 2015 "for, like, three weeks." (*Id.*). The last time she worked full-time was 2013. (*Id.*). At that time, she was director of admissions for TMS Health. (Tr. 897). She explained that she would travel to meet with doctors to review patients' prescriptions. (*Id.*). When the ALJ asked if the position was similar to a pharmaceutical representative, the plaintiff agreed. (*Id.*). She explained that this position ended when she had "a nervous breakdown" while traveling to California. (Tr. 898). Before this position, the plaintiff had worked in college admissions for nine years at Career Education Corporation. (Tr. 897). This position ended because she "blacked out at [her] desk twice," and because she "blacked out" and "had a[n] accident" on her way to work. (Tr. 898-99).

The plaintiff testified that she could dress herself "with help"; she needed help putting on her shirt because she could not lift her left arm "all the way up." (Tr. 899). She also needed help putting on her shoes because she had trouble bending down. (*Id.*). She explained that she had a shower chair and a walk-in shower, and that her daughter would help her in the shower. (Tr. 900). She did not do any of the cooking and cleaning, though she used to "[p]rior to this condition." (*Id.*). She also did not have any hobbies or special interests. (*Id.*). She had a driver's license, but she did not drive anymore "because [she] [would have] panic attacks." (Tr. 901). She testified that she could read a newspaper and see street signs if she wore her glasses. (Tr. 896). She could perform arithmetic, pay bills, and manage her own money. (*Id.*). She used a cane because of her vertigo and balance issues. (Tr. 895). She had been using a cane for two years. (*Id.*).

The plaintiff testified that her pain was "everywhere"; she had "football shoulders and neck" with "knots." (Tr. 902). Stress aggravated her pain. (*Id*.). She also explained that "getting [] out of [] bed" aggravated her pain. (Tr. 902-03). Taking a hot shower and using "goat lotion" helped the pain. (Tr. 903). She ranked her average pain level at ten out of ten. (Tr. 904). She did not take any pain medication "because [] the lining of [her] stomach [was] gone." (*Id*.). She explained that she could not "stand that long," could not "sit that long," and would have to pause when walking. (Tr. 905). When asked about her treatment schedule, the plaintiff explained that she just took pain medications but had stopped taking them. (Tr. 906). She had not had cortisone shots "in three years." (*Id*.). She would go to the doctor for a morphine shot for her pancreatitis. (Tr. 907).

The plaintiff also testified regarding her depression diagnosis. (*Id*.). She explained that she could not control her panic attacks; she did not name any triggers. (Tr. 907-08). She had been seeing a psychiatrist, but "Medicaid . . . cancelled it" because she "missed two appointments." (Tr. 908). She took medication for depression, but she denied that the medication helped address her symptoms. (*Id*.). She did not "go anywhere anymore." (Tr. 908-09). She could give strangers directions if they approached her and would not "get freaked out." (Tr. 909-10). She also explained that she had trouble concentrating; her memory "was not as sharp as it used to be." (Tr. 911). She did not watch television because of "pain in [her] eyes and . . . migraine headaches." (*Id*.). She did not think she could follow the plot of a movie because she could not concentrate. (Tr. 912). She could, however, research material online. (Tr. 913-14).

The plaintiff testified that she could lift and carry five pounds at a time, but only with her right hand. (Tr. 914). She could carry one gallon of milk to the register at a grocery store by holding it "close to [her] body." (Tr. 915). She could walk "[a]bout 10-15 feet" without having to pause.

(*Id.*). She would, however, need her cane to walk that distance. (Tr. 915-16). She could stand for "about 10 minutes." (Tr. 916). She could remain seated for "10-15 minutes." (*Id.*). She could not touch her toes from a standing position, but she could touch her knees. (*Id.*). She could not squat or stoop. (Tr. 916-17). She could reach only her right arm over her head and directly out in front of her. (Tr. 917). She could not use her fingers to sort coins or use zippers, but she could use her hands to hold on to larger items like an orange or a grapefruit. (Tr. 918). She could not deal a deck of cards. (*Id.*). Exposure to the heat or cold aggravated her symptoms. (*Id.*).

The plaintiff also testified that her diverticulitis caused severe stomach pain. (Tr. 921). The pain felt like "someone [was] stabbing [her]." (Tr. 922). The pain radiated from her lower intestines all the way to her chest." (*Id.*). She would eat applesauce and baby food because "any type of meat, any type of solid food would cause the pain to be so bad." (Tr. 923). She would spend 50% of her day in bed with her heating pad and ice pack due to the pain. (Tr. 923-24). The plaintiff also wore sunglasses and a back brace to the hearing. She explained that the sunglasses helped her with sensitivity to light. (Tr. 928). She had been wearing the back brace since December 2013, when she had a "head-on collision" which caused a herniated disc in her neck. (Tr. 929).

Mr. Warren Maxim, a vocational expert ("VE"), also testified at the hearing. (Tr. 931). The VE testified that the plaintiff's past employment as an "admissions evaluator" was skilled work at the sedentary exertional level and her past employment as a "sales representative, chemical and drugs" was skilled work at the light exertional level. (Tr. 931-32).

The ALJ then asked the VE to assume a hypothetical individual of the plaintiff's age, education and vocational background, limited to light work, who could stand and walk up to four hours and could sit up to six hours. (Tr. 932). Such individual would also require a sit/stand option, whereby she could sit for about thirty minutes, then alternate to a standing position for five

minutes, and then resume sitting. (*Id.*). Such individual could never climb ladders, ropes or scaffolds, could occasionally climb stairs and ramps, and could occasionally balance stoop and crouch, but could never knee or crawl. (*Id.*). Such individual could frequently handle and finger, but she could not reach overhead with the left upper extremity and could also not perform work with exposure to temperature extremes. (*Id.*). Additionally, such individual could perform simple, routine, repetitive tasks, could sustain concentration, pace and persistence for two-hour segments, and could have occasional interaction with coworkers and brief and superficial interaction with the public. (*Id.*).

The VE testified that such an individual could not perform any of the plaintiff's past work. (Tr. 932-33). The individual could, however, perform the following occupations: laundry folder, photocopy machine operator, and mail clerk. (Tr. 933).

The ALJ then asked the VE to assume the same hypothetical individual, but with the use of a cane for ambulation. (Tr. 933-34). In response, the VE testified that he "d[id]n't believe it would have any significant impact on the [occupations] [he] identified." (Tr. 934). If the cane was for balance, however, the individual would be unable to work. (Tr. 937). And if the hypothetical individual could only occasionally handle and finger, the use of the cane would "not . . . allow any work." (Tr. 934).

The ALJ then asked the VE to assume the same hypothetical individual, but with a sedentary exertional level instead of a light exertional level. (*Id.*). The VE testified that such an individual could perform the occupations of document preparer, surveillance-system monitor, and dowel inspector. (Tr. 934-35). If the same hypothetical individual was limited to lifting and carrying five pounds, she would still be able to perform the three identified occupations. (Tr. 935). If the hypothetical individual could not do any forward reaching with the left extremity, she could

7

no longer perform the occupation of dowel inspector, but could still perform the occupations of document preparer and surveillance-system monitor. (*Id*.). If the same hypothetical individual used a cane for ambulation, she could still perform all three occupations; however, if she needed the cane for balance, she could only do sedentary work. (Tr. 935-36). If the hypothetical individual could only occasionally handle and finger, she could only perform the surveillance-system monitor position. If the hypothetical individual was absent three to four days per month, she could not perform "any successful work at any exertion level." (Tr. 936).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[1] the ALJ found that the plaintiff met the insured status requirements through September 30, 2017. (Tr. 840). The ALJ then found that the plaintiff engaged in substantial gain activity in 2013, but, "[a]ffording the [plaintiff] the benefit of the doubt on the issue of work," found that "this was the sole year of work at SGA levels since her alleged onset date," December 31, 2010. (Tr. 840, citing 20 C.F.R. §§ 404.152(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*)). The ALJ addressed the "remaining findings" to the periods when the plaintiff did not engage in substantial gainful activity. (Tr. 840).

---

[1] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At step two, the ALJ concluded that the plaintiff had the severe impairments of "history of lumbar herniations," "history of sickle cell anemia," "history of pancreatitis," "history of diverticulitis," "history of rheumatoid arthritis," shingles, and a depressive disorder. (Tr. 840, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c))., the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 840, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Specifically, the ALJ concluded that the plaintiff's conditions did not meet Listings 1.04, 5.05, 5.06, 7.05, 14.07, 14.09 and 12.04. (Tr. 840-42).

At step three, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except she could stand/walk up to four hours and sit for six hours; she could never climb ladders, ropes or scaffolds; she could occasionally climb stairs and ramps; she could occasionally balance, stoop and crouch; she could never knee or crawl; she could frequently handle/finger; she could not engage in overhead reaching with her left upper extremity; and she could not work in exposure to temperature extremes or wetness. (Tr. 842). She also required a sit/stand option: "sit for [thirty] minutes, alternate to standing position for [five] minutes[,] [and] then resume sitting." (*Id*.). Finally, she could perform simple, routine repetitive work; she could sustain concentration, persistence and pace for two-hour segments; she could have occasional interaction with coworkers; and she could have brief and superficial interaction with the public. (*Id*.). The ALJ noted that the plaintiff uses a cane for ambulation. (*Id*.).

The ALJ concluded that the plaintiff was unable of performing her past relevant work. (Tr. 845, citing 20 C.F.R. §§ 404.1565 and 416.965). The ALJ found, however, that there were jobs that exist in significant numbers in the national economy that the plaintiff could perform, namely,

laundry folder, photocopy machine operator, and mail clerk. (Tr. 846). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from December 31, 2010, the alleged onset date, through May 15, 2019, the date of the ALJ's decision. (Tr. 847).

IV.   STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* The Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.

*See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff contends that the ALJ erred in three respects: 1) the ALJ failed to develop the administrative record by not obtaining a medical source statement from the plaintiff's treating physician, and by not obtaining the plaintiff's medical records from before February 17, 2013, from after August 30, 2018, and from the plaintiff's psychiatrist (Pl.'s Mem. at 1-10); 2) the ALJ improperly evaluated the plaintiff's fibromyalgia and chronic pain (*Id.* at 11-15); and 3) the ALJ's "Step Five Findings" were unsupported. (*Id.* at 15-24).

A.     THE ALJ DID NOT SATISFY HIS DUTY TO DEVELOP THE RECORD

The plaintiff argues that the ALJ failed to develop the record by not contacting any of the plaintiff's treating physicians to obtain medical source statements. (Pl.'s Mem. at 1-10). The plaintiff also argues that the ALJ erred by failing to obtain treatment notes. (*Id.*).

On appeal, this Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran*, 569, F.3d at 112 (citation & internal quotations omitted). The issue of whether an ALJ has satisfied his obligation to develop the record is one that "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant was represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128.

11

The Social Security Regulations provide that an ALJ may, but is not obligated to, recontact a treating physician, and should consider doing so when the existing record evidence is inconsistent or insufficient to make a disability determination. 20 C.F.R. § 404.1520b(b)(2)(i) ("We may recontact your medical source."). Thus, the ALJ retains the obligation to "develop the record when additional information is needed due to the vague, incompleteness or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, NO. 3:17 CV 396 (JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted). When the ALJ has failed to develop the record adequately, the court must remand to the Commissioner for further development. *See, e.g., Pratts*, 94 F.3d at 39.

However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33–34 (2d Cir. 2013) (summary order). "If the medical records themselves shed sufficient light on a claimant's ability or inability to perform work, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec'y*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (summary order) (remanding because the medical records "offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). Thus, "remand for failure to develop the record is situational and depends on the 'circumstances of the particular case, the comprehensiveness of the administrative records, and . . . whether an ALJ could reach an informed decision based on the record.'" *Holt v. Colvin*, No. 16-CV-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (quoting *Sanchez*, 2015 WL 736102, at *5-6).

Accordingly, the issue in this case is whether there was sufficient evidence in the record from which the ALJ could determine the plaintiff's RFC.

Here, the record reflects that the plaintiff was treated on multiple occasions by Dr. DeSouza, as well as several other medical providers. The record includes treatment notes and reports from each of these doctors. The earliest medical record is from the plaintiff's February 18, 2013 visit to the Emergency Room of Broward Health in Coral Springs, Florida. (Tr. 348-53). At that time, the plaintiff complained of flu-like symptoms. (*Id.*). She was diagnosed with an upper respiratory infection. (Tr. 352).

On July 26, 2013, the plaintiff presented to the Urgent Medical Center, Inc., in Plantation, Florida, complaining of left arm pain. (Tr. 307-16). Physician Assistant Jon Kudrowitz noted that the plaintiff complained of left arm pain "secondary to moving a suitcase and feeling instant pain at that time." (Tr. 307). She had since had trouble moving her arm. (*Id.*). She was not on any medications at that time. (Tr. 308). Treatment notes reflect that she "appear[ed] to be in moderate pain." (*Id.*). On examination, she had "localized pain to palpation left upper area around tricep area." (*Id.*). She had "limited flexion/extension due to pain," but the rest of the exam was "unremarkable." (*Id.*). An MRI of the left humerus was recommended; x-rays were unremarkable. (Tr. 309).

On August 17, 2013, the plaintiff was brought to Broward Health Imperial Point hospital in Ft. Lauderdale, Florida by law enforcement. (Tr. 324-26, 331-35). She "had sent a text message to her family stating that she did not want to live and left a will via text. Her family called 911." (Tr. 331). She experienced severe "depressed suicidal thoughts." (*Id.*). Treatment notes reflect that she exhibited the following symptoms: "depression, suicidal, no anxiety, no mania, not homicidal, not delusional, no hallucinations, no eating disorder, no irritability." (Tr. 332). On August 19,

2013, the plaintiff saw Dr. Jose C. Villalba for a "[r]ecurrent right gluteal erythematous eruption." (Tr. 326). Treatment notes reflect that "[i]t ha[d] an appearance of a viral infection, i.e. shingles with minimal surrounding erythema." (*Id.*). The plaintiff told Dr. Villalba that she had recurrent bouts of "blister-like lesions" in the past, which were "usually related to a stressful event." (*Id.*). Dr. Villalba noted that, at the time of this appointment, the plaintiff was "currently in the psych facility." (*Id.*). The record does not appear to include records from this time.

On October 29, 2013, the plaintiff returned to Broward Health facility for "[s]hingles crisis." (Tr. 355). She presented with a rash on her back, which had been present for four days. (Tr. 356). She had pain and burning, a fever and weakness. (*Id.*). She was diagnosed with a "possible shingles outbreak" and released following examination. (Tr. 357). The plaintiff left "against medical advice"; she had refused a CT scan. (Tr. 358-59).

On December 3, 2013, the plaintiff presented to Hilda Besner, Ph.D., and Alberto Avi Tcah, M.S. for a consultative examination regarding her mental status. (Tr. 362-64). The plaintiff stated that she felt "extremely depressed." (Tr. 363). She reported that she had never sought treatment for her mental health issues. (*Id.*). She did not attend church services or social activities, "though [she] used to in the past." (*Id.*). Drs. Besner and Tcah noted that the plaintiff was friendly and cooperative, her speech was coherent and easily understood, her task persistence was on target, her attention and concentration were good, her insight and judgment were adequate, and her mood was "extremely depressed and, at times, tearful." (*Id.*). She was oriented to person, place and time, her immediate and recent memory were fair, her general knowledge was variable, her abstract thinking was good, and she could perform simple calculations. (Tr. 364). Drs. Besner and Tcah gave the plaintiff a "fair" prognosis "[g]iven that she begin [psychiatric services]." (*Id.*).

14

She presented again at Broward Health facility on December 22, 2013, complaining of abdominal pain, nausea, vomiting and diarrhea. (Tr. 420). She described the pain as "crampy," and "fluctuating in intensity." (*Id*.). An abdominal CT scan indicated "a lobulated uterus suggesting fibroid formation." (Tr. 423). There was no evidence of appendicitis, but there was "diverticulosis of the retrosigmoid without diverticulitis." (*Id*.). Her liver, spleen, gallbladder and pancreas were all within normal limits. (*Id*.). She was prescribed Percocet and discharged. (Tr. 424).

On January 5, 2014, the plaintiff saw Dr. Jessenia Magua for a gynecological examination. (Tr. 433-43). Physical and gynecological examinations were normal. (Tr. 435-36).

The plaintiff returned to the Broward Health facility on September 5, 2014, complaining of "chest pain and unsteady gait, which seemed to be mostly vertigo in nature." (Tr. 380). Treatment notes reflect that acute coronary syndrome was ruled out. (*Id*.). An MRI of the plaintiff's brain showed "some small white matter disease." (*Id*.). She "tested definitely positive in terms of her vertigo" and was given medication. (*Id*.). She was diagnosed with "atypical chest pain," which "seem[ed] to be resolving," vertigo, and a "[s]mall area of induration in the right buttock area, probably cellulitis." (Tr. 381). Dr. Kathleen Joseph-McBean noted that she emphasized to the plaintiff the importance of obtaining a primary care physician. (*Id*.). Treatment notes also reflect that she had GERD symptoms and would sometimes have to eat only soft foods. (Tr. 384). A chest x-ray indicated that the plaintiff's lungs were clear, a CT scan of the plaintiff's brain was normal, and a CT scan of her abdomen and pelvis showed diverticulosis with no evidence of diverticulitis. (Tr. 385). Dr. Joseph-McBean recommended an MRI of the plaintiff's brain. (*Id*.).

A September 6, 2014 MRI of the plaintiff's brain indicated "3-4 small to moderate-sized signal changes in the white matter that [was] not periventricular." (Tr. 387). The results indicated

"[b]enign positional vertigo." (*Id.*). She was instructed on how to perform vertigo exercises and given medication. (*Id.*).

On September 22, 2014, the plaintiff presented to Lisa M. Winings, Psy.D., for a consultative mental status examination. (Tr. 445-48). The plaintiff denied having mental health difficulties prior to "approximately three years ago." (Tr. 446). At that time, she began "experiencing symptoms of depression in relation to her medical conditions and associated pain, physical limitations and psychosocial stressors." (*Id.*). She reported currently experiencing depressed mood, sleep and appetite difficulties, crying spells, anhedonia, and increased social isolation. (*Id.*). She reported that she had seen a psychiatrist and psychotherapist in the past, but she did not currently do so. (*Id.*).

Dr. Winings noted that the plaintiff's speech was coherent, logical and relevant, her auditory attention and concentration "appeared somewhat below average," her immediate memory processes "appeared average," and her delayed memory "appeared slightly below average." (Tr. 447). She was oriented to person, place and time, with no evidence of delusional thinking or perceptual disturbances. (*Id.*). Her mood, however, "appeared depressed," and her affect was "mood-congruent." (*Id.*). She reported occasional suicidal ideation. (*Id.*). Her insight "appeared average," her judgment "appeared below average," and her fund of information "appeared slightly below average." (*Id.*). Dr. Winings noted that the plaintiff's "[i]mpressions of depression were supported by the [plaintiff's] depressed mood and affect, psychomotor slowing crying during the evaluation, and somewhat below average abilities for attention, concentration and delayed memory." (*Id.*).

Dr. Winings diagnosed the plaintiff's with major depressive disorder, single episode, severe without psychotic features. (Tr. 448). She recommended therapy "to assist [the plaintiff] in

dealing with her symptoms and developing appropriate coping skills." (*Id.*). She also suggested group therapy and pain management. (*Id.*). Dr. Winings opined that the plaintiff's impairment would "persist for one year's time," and that she would have "difficulty maintaining competitive employment on a full time basis." (*Id.*). Dr. Winings indicated that the plaintiff's ability to understand, carry out, and remember instructions was not impaired, but that her ability to respond appropriately to supervisors, coworkers and work pressures was impaired. (*Id.*). Dr. Winings rated the plaintiff's prognosis as "guarded" and "dependent upon the implementation of recommended interventions." (*Id.*).

The plaintiff returned to Broward Health facility on December 15, 2014 with cough, fever, chest pain, chills, rhinorrhea, and nasal congestion. (Tr. 498-504). She was diagnosed with sinusitis, bronchitis, and pancreatitis. (Tr. 503-04).

The plaintiff thereafter presented to the emergency room at Northwest Medical Center on June 15, 2015, complaining of chest pain, which had been present for two days. (Tr. 529-30). She also complained of shortness of breath, nausea, and vomiting. (*Id.*). A CT scan of the plaintiff's abdomen and pelvis revealed sigmoid diverticulosis without diverticulitis, no intestinal obstruction, and an unremarkable evaluation of the solid organs of the abdomen. (Tr. 534-35). A CT angiogram of the chest and abdomen "was nondiagnostic." (Tr. 552). A chest x-ray indicated that her lungs were clear and was otherwise unremarkable. (Tr. 537, 552). An EKG showed "some evidence of left ventricular hypertrophy. (Tr. 552). She was diagnosed with "abdominal pain [status-post] EGD with gastritis and esophagitis" and "chest pain, etiology unclear, appears musculoskeletal, no [Acute Coronary Syndrome]." (Tr. 565).

On June 22, 2016, the plaintiff presented to Dr. Adrian Klufas, M.D., for a consultative examination. (Tr. 829-31). The plaintiff described to Dr. Klufas her past medical history and

current symptoms, including lower back pain going to the left extremity, recurrent bursitis in the left shoulder, recurrent episodes of abdominal pain, frequent constipation, sickle cell disease with diffuse pains, recurrent shingles, rheumatoid arthritis and depression. (Tr. 829-30). On examination, the plaintiff walked without an assistive device but she "tended to weight bear more to the right than the left." (Tr. 831). The plaintiff's abdomen was mildly distended, and she experienced mild tenderness to palpation diffusely of her mid-upper and lower abdomen. (*Id*.). She complained of pain upon flexion of her lumbar spine, and a straight leg raising test was positive on the left. (*Id*.). She resisted any range of motion attempted above the neck level of the left upper extremity. (Tr. 831). Dr. Klufas noted that the plaintiff had diminished range of motion in her left shoulder, diminished sensory in the left upper and lower extremity, and diminished lumbar flexion. (Tr. 831). Dr. Klufas did not give an opinion on the plaintiff's ability to work.

Between June 15, 2015 and May 8, 2017, there are no medical records in the administrative record. On May 8, 2017, the plaintiff was admitted to Bridgeport Hospital. (Tr. 1174). She was treated for pancreatitis, major depressive disorder and abdominal pain. (Tr. 1174-75). She complained of epigastric abdominal pain, which was sharp, radiated across her upper abdomen and into her back, and was made worse with meals. (Tr. 1175). She also complained of severe nausea, vomiting anorexia, and occasional diarrhea with bright red blood in it. (*Id*.). Treatment notes reflect that "[the plaintiff] ha[d] been in chronic pain and just c[ould]n't take it anymore"; the plaintiff "state[d] she called a crisis line and was referred here for depression." (Tr. 1180). The plaintiff was "tearful at triage." (*Id*.). She denied suicidal ideation. (*Id*.). She was positive for appetite change, visual disturbance, chest pain, abdominal pain, nausea, myalgias, syncope, light-headedness, headaches, depression, dysphoric mood and sleep disturbance. (Tr. 1181).

While hospitalized, the plaintiff saw a pain management physician for her abdominal and joint pain. (Tr. 1190-95). She rated her pain as a nine out of ten. (Tr. 1191). Her morphine dose was increased, and it was recommended that she follow up with the Bridgeport Hospital Sickle Cell Clinic. (Tr. 1194-95). Before her discharge, she started on Cymbalta. (Tr. 1178). Treatment notes reflect that gastroenterology assessed her current episode as "chronic abdominal pain rather than pancreatitis episode." (Tr. 1218). She was discharged on May 11, 2017. (Tr. 1174).

The plaintiff returned to Bridgeport Hospital on May 14, 2017. (Tr. 1275-1302). She complained of abdominal pain and inability to hold down food. (Tr. 1288). She reported that she had "not been feeling better" since her discharge on May 11, 2017; she had been experiencing multiple episodes of nausea, vomiting, and yellow diarrhea. (Tr. 1276). On examination, Dr. David J. Peregrim noted "diffuse tenderness to palpation, mostly in epigastrium." (Tr. 1278). She was treated and discharged that afternoon. (Tr. 1278-80).

On May 17, 2017, the plaintiff first saw Dr. Richard DeSouza of Whitney Internal Medicine in Hamden, Connecticut. (Tr. 1405-10). The plaintiff told Dr. DeSouza that she had "[more than] [twenty] presentations to the hospital for [abdominal pain] in the past [four] years." (Tr. 1405). She also reported her diagnosis of shingles in her left buttock. (*Id*.). Regarding her mental health, the plaintiff noted that she was scheduled to see a psychiatrist the upcoming Friday, she was on Cymbalta, and that she had frequent episodes of "blacking out." (Tr. 1406). She reported that she loses consciousness suddenly sometimes and other times feelings lightheaded but does not lose consciousness. (*Id*.). She also reported persistent vertigo and chronic pain in her neck and low back. (*Id*.). On examination, the plaintiff's abdominal system was "soft," her bowel sounds were normal, and there were no distensions or masses. (Tr. 1407). She had a normal mood and affect. (*Id*.). Dr. DeSouza referred the plaintiff to a rheumatologist. (Tr. 1408).

On May 19, 2017, the plaintiff saw Licensed Clinical Social Worker ["LCSW"] Kimberly Willis-Rinaldi for an initial assessment. (Tr. 1303-1308). LCSW Willis-Rinaldi noted that the plaintiff "present[ed] with a pleasant affect although at times appear[ed] overwhelmed and tearful when recounting her past medical history and interactions with family." (Tr. 1303). The plaintiff used a cane to walk, walked very slowly, had an R compression sleeve on her hand and wrist, and wore a back brace. (*Id*.). She had been unable to keep down anything but water or broth. (*Id*.). She had constant pain in her abdomen and had been weak and fatigued. (*Id*.). She reported a history of depression dating back to at least 2002. (*Id*.). She also reported currently having a prescription for Cymbalta for depression and pain. (*Id*.). LCSW Willis-Rinaldi recommended weekly therapy sessions. (Tr. 1307).

The plaintiff returned to Dr. DeSouza on June 15, 2017 for difficulty sleeping, depression and anxiety. (Tr. 1402-05). She also reported abdominal discomfort. (Tr. 1402). Dr. DeSouza prescribed medication and recommended that the plaintiff continue to see her psychiatrist on a weekly basis. (Tr. 1403).

On June 26, 2017, the plaintiff presented at the Bridgeport Hospital Emergency Room. (Tr. 1309). She reportedly had not slept in three weeks. (*Id*.). She had a 24-hour Holter monitor placed on her to measure her heart rate. (Tr. 1316-17; 1369-75). The record includes an October 11, 2017 scan of the Holter report, though it is unclear when the report was first completed. (Tr. 1318-19). Testing was interpreted as "benign"; "symptoms [of] pain in arm, chest, nausea, light-headed all correspond to sinus rhythm or sinus [illegible]." (Tr. 1318, 1373).

On December 5, 2017, the plaintiff returned to the Bridgeport Hospital Emergency Room for cough and abdominal pain. (Tr. 1323-24). She also reported diarrhea and nausea. (Tr. 1324).

On examination, her abdominal area was "generally uncomfortable, [but] no focal tenderness." (Tr. 1326). She was diagnosed with "likely gastroenteritis" and released. (*Id*.).

On May 11, 2018, the plaintiff saw Dr. Ruth M. Grant for a consultative psychological evaluation. (Tr. 1349-53). The plaintiff relayed to Dr. Grant her medical and social history. (Tr. 1349-50). Dr. Grant noted that the plaintiff's "story was illogical at times in that she could not tell the story from one year to the next." (Tr. 1350). She found the plaintiff's story "difficult to follow." (*Id*.). On examination, the plaintiff's speech was logical, her affect depressed, her sensorium clear and coherent, and her attention and concentration were moderately impaired. (Tr. 1351-52). She had "borderline intellectual functioning." (Tr. 1352). Her insight was fair. (*Id*.).

Dr. Grant opined that the plaintiff could follow and understand simple instructions; she might have moderate difficulty doing simple tasks independently; she would have significant difficulty maintaining concentration and attention; she might have significant difficulty maintaining a regular schedule; she might have moderate difficulty learning a new task; she might have significant difficulty performing complex tasks independently; and she might have significant difficulty making appropriate decisions, relating adequately to others, and dealing with stress. (Tr. 1352-53). Dr. Grant gave the plaintiff a "fair" prognosis. (Tr. 1353).

On May 21, 2018, the plaintiff saw Dr. Herbert Walter Reiher for a consultative internal medicine examination. (Tr. 1355-59). Dr. Reiher noted the plaintiff's medical history as follows: diagnosis of sickle cell trait in 1972; diagnosis of rheumatoid arthritis in 2002; diffuse bilateral joint pain of large and small joints; diagnosis of herniated cervical and lumbar discs in 2012; low back pain radiating to the right leg; neck pain radiating to the left arm; recurrent vertigo; stroke and possible seizure in 1993; recurrent shingles since 2003; chronic pancreatitis diagnosed in 2015; and chronic epigastric discomfort. (Tr. 1355).

On examination, the plaintiff "appeared to be in no acute distress." (Tr. 1356). Her gait was slow with a slight limp, and she could not walk on her heels and toes. (*Id*.). She needed help getting on and off the exam table, but she could rise from a chair without difficulty. (*Id*.). There was tenderness of the plaintiff's epigastric area upon palpation. (Tr. 1357). She had full range of motion of her right shoulder, elbows, forearms, wrists, and hips bilaterally. (*Id*.). Her cervical spine showed "flexion 40 degrees, extension 40 degrees, and lateral flexion 40 degrees bilaterally," with full rotary movements bilaterally. (*Id*.). Her lumbar spine showed "flexion 40 degrees, full extension, full lateral flexion bilaterally, and fully rotary movement bilaterally." (*Id*.). Straight leg raising tests were negative bilaterally. (*Id*.). Her joints were stable. (*Id*.). Her strength was five out of five in her upper and lower extremities. (*Id*.). Her grip strength was five out of five bilaterally. (Tr. 1358).

Dr. Reiher diagnosed the plaintiff with rheumatoid arthritis, back pain, neck pain, chronic pancreatitis, sickle trait, recurrent shingles and stroke. (Tr. 1358). Her prognosis was stable. (*Id*.). Dr. Reiher noted that the plaintiff had "moderate postural limitations due to rheumatoid arthritis, back pain, and neck pain producing moderate limitations with climbing, stooping, bending, crawling, kneeling, crouching, and reaching." (*Id*.). According to Dr. Reiher, she had no fine motor limitations, nor vision hearing or speech limitations. (*Id*.). She did, however, have "environmental limitations of heights which could produce decreased balance." (*Id*.).

On May 24, 2018, the plaintiff saw Dr. DeSouza for her annual physical. (Tr. 1361-65). The plaintiff reported that the joint pain in her hands, wrists and elbows was worsening, and she had recurrent shingles. (Tr. 1361. 1422). Treatment notes reflect that she "[n]eeds another referral to [a] new psychiatrist. Last time [she] saw [a] psychiatrist was a year ago." (Tr. 1362). At this

appointment, the plaintiff reported chronic back pain. (Tr. 1422). Treatment notes reflect that the plaintiff had trouble dressing, bathing and housekeeping. (*Id*.).

The last medical record is from August 30, 2018 when the plaintiff was seen at the Yale Center for Musculoskeletal Care. (Tr. 1376-1400). The plaintiff reported "diffuse pain all over her body." (Tr. 1377). Treatment notes reflect that the plaintiff "[p]resent[ed] consistent with fibromyalgia/myofascial pain syndrome." (*Id*.). "She may have underlying discogenic back pain, but unfortunately she has exhausted all treatment options." (*Id*.). Dr. Robin Raju advised her to follow up with rheumatology and psychiatry and to try acupuncture. (*Id*.). She was advised to reduce her Motrin intake and continue her lumbar corset brace. (Tr. 1378). She was diagnosed with fibromyalgia and myofascial pain syndrome. (Tr. 1383).

Thus, a review of the record reveals that, although the plaintiff alleges an onset date of December 31, 2010, there are no medical records from before February 18, 2013. Similarly, although the plaintiff's administrative hearing was held on April 24, 2019, there are no medical records from between August 30, 2018 and April 24, 2019. The medical records in the administrative record are from February 18, 2013 to August 30, 2018. Moreover, the record does not include a medical source statement from Dr. DeSouza. The record does include, however, reports from five consultative examiners: Drs. Klufas and Reiher conducted physical examinations and Drs. Bessner, Winings, and Grant conducted mental examinations.

The plaintiff argues that, in a case such as this where she has a number of mental and physical impairments, and there are no medical source statements from treating physicians, it is "impossible to ascertain what [the plaintiff's] treating physicians and clinicians believed that she could or could not do on a function-by-function basis." (Pl.'s Mem. at 7-8). As a result, the plaintiff argues, the "ALJ's [RFC] finding . . . was based on exactly zero opinion evidence from

any of [the plaintiff's] treating providers." (*Id.* at 9-10). Additionally, because the ALJ assigned "little weight" to the consultative examinations, the plaintiff argues that the RFC finding was based on "no discernible treating physician's opinions." (*Id.* at 10). The Court agrees.

Preliminarily, the ALJ had an affirmative duty to develop the record fully by obtaining an opinion from the plaintiff's treating physician.  *See e.g., Peed v. Sullivan*, 778 F. Supp 1247 (E.D.N.Y. 1991) (remanding for failure to obtain an opinion from treating physician). It is well established that "the SSA recognizes the 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). Consequently, "the expert opinions of a treating physician are of particular importance to a disability determination." *Prince v. Berryhill*, 304 F. Supp. 2d 281, 288 (D. Conn. 2018) (citing *Hallet v. Astrue*, No. 11-CV-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that, "[b]ecause the expert opinions of a treating physician as to the existence of disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician")). Yet here, the ALJ failed to obtain such an opinion from Dr. DeSouza.

The defendant argues that "the absence of opinions from Plaintiff's treating physicians does not require remand because the record contains enough evidence for the ALJ to assess Plaintiff's RFC." (Def.'s Mem. at 5). Specifically, the defendant maintains that the treatment notes and opinions from the state agency medical consultants provided sufficient information upon which to base the RFC finding. (*Id.* at 5-8).  "The Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Moreau*, 2018 WL 1316197, at *7 (internal quotation marks omitted).

24

However here, contrary to the defendant's argument, the ALJ erred by developing an RFC based on his own interpretation of the medical record.

First, as to the plaintiff's mental impairments, the ALJ specifically noted that he gave the "opinions and recommendations" of Drs. Winings and Grant "very little weight." (Tr. 845). In so finding, the ALJ explained that the examiners' findings were based on the plaintiff's self-reports and were not corroborated elsewhere in the record. (*Id*.). In his decision, the ALJ also did not mention the opinions of the two consultative examiners who evaluated the plaintiff in 2014, Drs. Bessner and Tcah. In fact, the only medical opinions in the record that the ALJ appears to have relied on were from the state psychological consultants Drs. Ruddock and Augenbraun, who did not personally examine the plaintiff and who did not base their opinions on the full record. Dr. Ruddock conducted her review on October 4, 2014, and Dr. Augenbraun conducted her review on August 23, 2018. (*See* Tr. 122, 987). Thus, in this case, not only did the ALJ fail to seek the opinion of the plaintiff's treating physician, but he also discounted or ignored the opinions of four consultative examiners in favor of his own interpretation of the medical record.

Moreover, the Court agrees with the plaintiff that there may be mental health records missing from the administrative record. On August 17, 2013, the plaintiff was hospitalized for mental health issues. (Tr. 324-26, 331-35). A medical record from that hospital stay noted that she was "currently in the psych facility." (Tr. 326). The administrative record does not include any psychiatric records from this time. Similarly, on June 15, 2017, Dr. DeSouza noted that the plaintiff should continue to see her psychiatrist on a weekly basis. (Tr. 1403). While the record includes a May 19, 2017 initial assessment from LSCW Willis-Rinaldi, there are no further psychiatric treatment notes in the administrative record. (Tr. 1303-1308).

Additionally, as to the plaintiff's physical abilities, the ALJ gave "partial weight" to Dr. Reiher's opinion. (Tr. 845). The ALJ credited "the clinical findings for normal strength and use of extremities," but "d[id] not accept the balance limitations." (*Id.*). Again, he did not cite another physician's opinion in so finding; instead, he relied solely on his own interpretation of the treatment notes. Moreover, as to Dr. Klufas, who examined the plaintiff but did not opine on her functional abilities, the ALJ noted "there is nothing contained in the examination that would prevent the [plaintiff] from performing jobs falling within the residual functional capacity as stated above." (Tr. 844). Dr. Klufas, however, did find limitations. Dr. Klufas found that the plaintiff had diminished range of motion in her left shoulder, diminished sensory in the left upper and lower extremity, and diminished lumbar flexion. (Tr. 831). By noting that nothing in Dr. Klufas's examination would prevent the plaintiff from performing jobs falling within the ALJ's RFC, the ALJ again improperly independently assessed medical findings. The ALJ also relied on the opinion of the state medical examiner Dr. Virginia Rittner, who did not examine the plaintiff and who reviewed the plaintiff's medical records on August 8, 2018. (Tr. 986).[2]

Here, a remand is warranted because the ALJ did not have a function-by-function assessment by any of the plaintiff's treating physicians explaining what the plaintiff could and could not do with respect to her physical and mental impairments. Instead, he relied solely on his own interpretation of the medical record and the opinions of the state agency consultants. Contrary to the defendant's argument, to do so was legal error. The opinions of the state agency consultants are insufficient. *See Prince*, 304 F. Supp. 2d at 288-89 (D. Conn. 2018) (holding that the ALJ could not ascertain the claimant's limitations without views from the treating physician as to the claimant's RFC in light of her impairments); *Paredes v Comm'r of Soc. Sec.*, No. 16-CV-00810

---

[2] Notably, the ALJ did not fully credit Dr. Ritter's opinion. Instead, he noted that he "accepts that the [plaintiff] can perform light work" but "gives the [plaintiff] the benefit of the doubt and added a sit/stand option." (Tr. 845).

(BCM), 2017 WL 2210865, at *18 (S.D.N.Y. May 19, 2017) (remanding where the only medical opinion on the claimant's physical limitations came from a non-examining medical expert "who based his opinion . . . entirely on his review of non-opinion medical records from the claimant's treating physicians and the claimant's testimony at the second of his two hearings").

Further, this case is not one in which the medical records shed enough light on the plaintiff's ability or inability to perform work, such that a treating physician's opinion was unnecessary. Neither the medical records nor the treating physicians' notes sufficiently document "how [the plaintiff's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen*, 697 F. App'x at 109. This is especially important where the ALJ has improperly discounted medical providers' opinions in favor of his own reading of the treatment records. *See Holt*, 2018 WL 1293095, at *7; *Guarino v. Colvin*, No. 14-CV-598 (MAT), 2016 WL 690818, at *2 (W.D.N.Y. Feb. 22, 2016) (holding that an ALJ cannot determine the plaintiff's RFC solely "on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence."); *Wilson v. Saul*, No. 19-CV-1097 (WWE), 2019 WL 2603221, at *4 (D. Conn. Jun. 25, 2019) (stating that the ALJ "may not substitute his own judgment for competent medical opinion") (citation & internal quotations omitted); *Pacheco v. Saul*, No. 19-CV-987 (WIG), 2020 WL 113702, at *7 (D. Conn. Jan. 10, 2020) (explaining that "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.").

Accordingly, a remand is warranted. The ALJ did not have a functional assessment from the plaintiff's treating physician and did not rely on the opinions of the mental health consultative

examiners. Indeed, the ALJ gave "little weight" to the opinions of the mental health consultative examiners and only "partial weight" to the internal medicine consultative examiner. The ALJ relied instead on his own reading of the treatment notes and the opinions of the state agency consultants. Because the state agency consultants' opinions were insufficient, and the treatment notes do not show the full extent of the plaintiff's functional limitations (or lack thereof), the ALJ improperly developed the RFC. On remand, the ALJ must further develop the record and reconsider the plaintiff's RFC.

## VI.   REMAINING ARGUMENTS

The plaintiff also argues that (1) the ALJ improperly evaluated the plaintiff's fibromyalgia and chronic pain; and (2) the ALJ's Step Five findings were unsupported. The Court declines to address the plaintiff's remaining arguments because "upon remand and after a de novo hearing, [the ALJ] shall review this matter in its entirety." *Faussett v. Saul*, 18-CV-738 (MPS), 2020 WL 57537, at *5 (D. Conn. Jan. 6, 2020) (citing *Delgado v. Berryhill*, No. 17-CV-54 (JCH), 2018 WL 1316198, at *19 (D. Conn. Mar. 14, 2019) (holding that because the case is "already being remanded for other reasons," and "because [the plaintiff's] RFC may change after full development of the record," the ALJ is likely to need to reconsider the other steps in the five-step analysis)); *see also Pacheco*, 2020 WL 113702, at *8 (holding that, on remand, the Commissioner must address the other claims of error not discussed in the ruling); *Moreau*, 2018 WL 1316197, at *4 ("Because the court finds that the ALJ failed to develop the record, it also suggests that the ALJ revisit the other issues on remand, without finding it necessary to reach whether such arguments would themselves constitute legal error justifying remand on their own.").

VII.   <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 15) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 16) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 10th day of August, 2020 at New Haven, Connecticut.

<u>  /s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge